Our first case today is 4-14-0593, the estate of Gerald Slightom v. Pollution Control Board. For the appellant is Patrick Shaw. For the appellee is Frank Bizat. Mr. Shaw, are you ready to proceed? May it please the court. My name is Patrick Shaw. I'm an attorney for the estate of Slightom. The estate of Slightom, my client had the audacity to volunteer to clean up an underground storage tank mess in reliance upon government approvals and decisions that it would need to pay no more than $10,000. We're here to ask today for this court to apply the law as it exists today. That law states that the eligibility and deductibility terminations shall be made by the Office of the State Fire Marshal from Section 57.9C of the Illinois Environmental Protection Act. If that had been done, there would be no problems, no issues. In this case, the site would be cleaned up by now. Instead, the Pollution Control Board, at the request of the Illinois Environmental Protection Agency, applied old law that had been repealed in 1993, law that is not on books, not visible to lawyers or lay people, without access to legislative surplus pamphlets or things that you can find at judicial libraries. That old law was repealed in 1993, provided for the Illinois Environmental Protection Agency to make eligibility and deductibility terminations. When that law was repealed, going forward, the legislature indicated that no more releases shall be governed under the old law. The old law had been in existence for a few years. It was a provisional stage of the regulation of underground storage tanks. Certainly, the legislature thought the new program was superior. It was to be used going forward. But as with many legal changes, the legislature and sometimes the courts recognized that parties have reliance interests based upon previous programs and allowed older releases to stay in the old program, but gave the option for older releases to elect to be governed by the new program. The new program is known as Title 16 today, and Title 16 is the new law or the existing law which we ask to be applied. Previously, when the issue of multiple deductibility determinations had come before the Illinois Pollution Control Board, the question the board has asked is, what program are we under? And this has become more obscure as time has come by. We're talking about events from 25 years ago or laws from 25 years ago. But in the case of Mixed Garage, which we attached to the appendix of our brief, there were three deductible determinations made. I believe it's two by the Office of State Fire Marshal, one by, or two by the Illinois Environmental Protection Agency, one by the Office of State Fire Marshal. The board asked the question that we would also think they should have asked here, which is, what law are we under? What is the program? What is the law? And they looked at it and said, Mixed Garage is a release that occurred prior to the 1993 repeal. And there's no evidence in the record that they volunteered to come under the new law. Therefore, they are governed by the old law. And the old law only authorized the Illinois Environmental Protection Agency to make eligibility deductibility determinations. Thus, the answer was clear. The agency determination is the only legally recognized determination. Our situation is similar, but, you know, essentially the opposite. One difference is, the estate of Gerald Slydom was not considered traditionally under the law to be eligible for any reimbursement from the Underground Storage Tank Program. The way the program was created, it's essentially somewhat like a property insurance concept. What is insured is the tanks. The owner and operator of the tanks has access to the fund. And thus, when situations occurred where a cleanup began, one of the first things you almost always do in a cleanup is you remove the tanks. The tanks are destroyed or thrown into the landfill. If the cleanup is not completed, subsequent ownership of the tanks is impossible in the language of the Act prior to around 2006. So, new property owners might inherit these problems without any access to the fund. And if you may notice from sort of the background in this case, there's not a lot of push to get old properties to be cleaned up. This is a 1990 incident, and there's almost no indication that anything other than a letter was written saying, you know, please clean this up. The law was changed in 2006 to provide... So the estate is seeking reimbursement for this cleanup? The estate is seeking reimbursement for the payments that were under the budget, for the work they did under the budget that was approved. Okay, and was it $83,000 requested? I believe so. Did the estate receive a check for that amount, $83,908? What, I mean, I believe what you're referring to is that during the course of the litigation, the Illinois Bioprotection Agency basically decided to try to end the case, and they sent a check. And the way the applications and the process works is the check went to the estate's consultant's lender. That is where the money went. So there was a check for, I believe, approximately that amount. It went into the possession of a third party, basically because the work was performed on, you know, paid for on credit.  And what... Is the EPA saying they want it back, or what do we hear about if that... Is that money available to the estate, or the paid bills of the estate, or what does the status say? No, that money is not in possession of the estate. The estate engaged the contractors to perform the work with the understanding that the contractors would get paid, you know, from the fund. The pay when paid kind of concept. And no, we're not here on the attempt by the agency to seek that money back. After the board declined to dismiss the case on the grounds that there had been a payment made, the agency sent out another letter saying, you owe us $83,000. That letter resulted in an appeal. The estate appealed that letter, and that issue is still before the board. The EPA is claiming that this $83,000 should be paid back to the state? Yes. And that's what's at issue in this litigation? Well, I mean, technically, no. Technically, no, because there's a subsequent case in which they're seeking that money back. Here, what the agency is arguing is that, you know, you don't get reimbursed at all. What was appealed was a letter saying, I mean, all these agency determinations are in the form of a letter. What was appealed was a denial of a payment request. We asked for payment for the work that was performed. It was work that was performed under the budget. Part of the complication here is that this last bit of work wasn't the only bit of work. So initially, there was work done under a budget. Okay. Well, I was just having difficulty trying to figure out how this payment fits into this whole scheme. Well, I mean, according to the board's ruling, it doesn't fit in at all. They basically said it wasn't something you were authorized to do, and so, therefore, it has no legal effect. What we've argued in one of our arguments is that that was a voluntary payment. And under the voluntary payment doctrine, you know, they paid that money, and that waves the legal issue that they had initially objected to. So I kind of got confused here. Are you saying that whatever this court decides today has no impact on this $83,000 that the consultant, I guess, currently has? I mean, our decision doesn't affect where that money ends up. Well, there's a case waiting for the ruling here from this court about whether or not the agency was correct in the determination here. If the agency was correct, there's going to be a subsequent dispute about what the agency's authority is to seek reimbursement. If the agency was incorrect, that it should not have changed its position after the budget was approved and the work was performed, then there is no issue. The subsequent appeal is going to be dismissed as moved. Subsequent appeal to the board. Okay, so should we rule in your favor today? Yes. That does have an effect on ultimately who gets or gets to keep the $83,000?  Okay, that's what I was trying to get at. I mean, the subsequent appeal has a subsequent issue that is not here about whether or not the agency can use an administrative process to get money back. It has questions to do about whether or not, you know, is there something in the statute that authorizes the agency to do that? Is it fair for the agency to seek to do that when it knows that the money, you know, went to a third party? Those are additional issues that are not here before the record. But there is a question about whether or not when the agency denied the application for payment, it started this process, whether or not that was legal? Would it be fair to say that your argument to this court today is that the state fire marshal set the deductible $10,000 according to law, whether they were right or wrong, the agency is bound by that $10,000 that the state fire marshal came up with? Yes. So it doesn't make any difference even if the state fire marshal is wrong in how they arrived at the $10,000 figure? I have argued just for defensive purposes that it was a correct determination, but most of the time in administrative law it's not necessarily anything other than deciding who gets to decide. Who decides what the eligibility deductibility amount is? And that's sort of the approach that was taken by the consultant here. The consultant gave an initial opinion. I think that he's looking at this information. It looks to me like it's a $15,000 deductible. That's enough information to submit an application to the state fire marshal to see what they say. And once it gets to the state fire marshal, the fire marshal could have said $5,000 to $100,000. There's a variety of number of deductibles that are out there. And this is a practical matter. You either live with it or you appeal it. And the state fire marshal deductible determinations are appealable also. And so I say also, like all these other plans and budgets that were performed in this case and approved before the work was done, before the expenses were incurred, and then after that you ask for payment. So you didn't do the work until you knew there was a $10,000 deductible that had been approved by the fire marshal. Is that correct? Yeah, even more than that. I guess I was talking about before, subsequent property owners didn't have access to the fund. The estate would not have elected to come into this program if the deductible was $100,000. They would have dropped this property. The estate has, I think, somewhere in the record, I think we submitted the initial inventory of the estate. I think it was something like $60,000 of assets. If there's a $100,000 deductible, it's going to be impossible for them to pay that. So they would not have elected to enter this program. They would have dropped it. It would have become a problem for the community, which this will continue to be an eyesore, an unattractive property. It would be something that is what we call brownfields, a property that had a useful commercial use and no longer does so. But going beyond that, each step of this program involves preapproval of the work and budget. You perform the work, and then you have to come back and you apply for payment for the work and say, here's canceled checks, here's invoices to show that we did the work that was approved and budgeted. So you slice it even thinner and say that if they had raised the issue of the deductible when we saw preapproval of the plan and told us that the deductible is now $100,000, then they wouldn't have done the work because they still wouldn't have had it. They would have stopped at that point in time. I mean, I think that was the point the dissent made at the pollution control board. I think her preference appears to have been to deal with it that way, that you can't raise issues about the amount of money owed or to be paid after the work is performed. You have to raise that at the plan stage. Frankly, that's probably not my preference. It's not what we're asking for here because that essentially is just going to stop. That will resolve the amount of money expended up to this point in time, but it's going to work from the site. We think that the proper result is the larger one that simply looks to the state fire marshal as the person in charge if he made the determination. I can be easily cynical about that. If the state fire marshal makes a decision that's bad for my client and my client did not appeal it and it was the wrong decision, I'm without recourse also. I mean, that's the way the game is played. And the benefit to that system in which appeal rights are available, but if you appeal a fire marshal determination within 35 days, is that you've got finality and you've got certainty on which you can then take action in the future. This program relies substantially on voluntary actions from parties. It's very much a carrot program. In particular, we get down to election to proceed as owner. One of my colleagues in a case before the board called these people heroes. And I've never been quite comfortable with that because I also know, and I know what the response from the government will be, is that many of these people who are heroes are looking to make money off of it. I don't have a problem with that. That's the only way these abandoned sites are going to come back into economic use is if there's incentives to do that. And these have got to be economic incentives. Land, you can go buy a house down the street or here or there, but a lot of this land that's polluted costs more than it's worth. And so it will never come back into economic use without the benefits of an insurance program that was created for this purpose, and without the ability for a complex set of contractors, engineers, and consultants to make deals with the owners and operators that give everybody the security that if we go through this program, we're going to get paid at the end of the day. Most of these sites are basically end-of-life issues. The gasoline service station is no longer viable. In particular, the tanks have been removed. There's no more money coming in that way. The insurance program holds an important purpose for that. Council, a few minutes ago you made the statement the estate would have dropped the property. What did you mean by that? I'm not an estate attorney, but I think what they would have done is none of the beneficiaries would have accepted the property. I think the estate has to manage the inventory, and they look at this and say it's zero. Nobody would have taken possession of the property. You mean like a disclaimer? I think that's what I might be referring to. Some of my partners have done this before. I know it's available. It's maybe not something people like to think about, but the property did not have any value, and there's no way, I believe, to force beneficiaries to take title to land they don't want to take. So that's how that would have unfolded. I guess it would have become a tax issue for the county, and then the county would have stepped in here. Some of the people who come in on this election to proceed the process have been units of government. They're the ones who also have vested interest in this, and they have to make the similar types of decisions and workarounds. Sure, they may not be getting any money off it. They may actually donate the property to somebody who put it in economic use, but they rely upon this program in a similar way that we have. We would just like the law to be applied as it exists today, and I think my time is about running out, but unless there's any questions, I'll thank you for your attention. Thank you, counsel. You have additional time on your phone. Mr. Bissett? May it please the Court? My name is Frank Bissett, and I represent the respondents, the Illinois Pollution Control Board and the Illinois Environmental Protection Agency. The Board's decision affirming the EPA's application of the $100,000 deductible should be affirmed for three main reasons. First, the EPA was not statutorily required to apply the $10,000 deductible determination made by the State Fire Marshal. Second, the EPA did not re-review the Stage 3 plan and budget when it denied Petitioner's request for payment from the fund for Stage 3 investigation costs. And third, Petitioner has not proved by clear and unequivocal evidence that Petitioner has denied the application of estoppel in this case. With regard to the first statutory issue, this entire proceeding arises from an underground tank leak from five different tanks that was first reported and discovered back in 1991. At that time, the EPA was the agency that was responsible for making eligibility and deductibility determinations, and in 1991, the EPA made such a determination with regard to this incident, finding that Slidem was eligible for payment from the fund, but subject to a deductible of $100,000. In 2008, Petitioner filed an application with the State Fire Marshal for an eligibility and deductibility determination, and at that time, the State Fire Marshal, which was authorized to make such determinations with regard to newly reported leaks, found that a $10,000 deductible applied. And so when the EPA rendered the decision that has led to judicial review, or review from the board, and that is now before this Court, at that time the EPA was faced with a request for payment from the fund and two existing deductible determinations. One by the EPA in 1991, at which time it was the agency authorized to make determinations following the report of a leak, and one by the State Fire Marshal made in 2008. The EPA then resorted to the applicable administrative rules, Section 734.615.B.4, which provided that when you have two different deductibles for the same site and incident, the higher deductible must apply. Now, Petitioner is arguing in this appeal that the EPA and the board erred by applying an administrative rule because Petitioner is arguing that the EPA was statutorily required to apply the State Fire Marshal's $10,000 deductible determination. In support, Petitioner is signing to Section 57.884 of the Act, which directs the EPA to apply a State Fire Marshal deductibility determination made in accordance with Section 57.9. And Section 57.9 generally deals with deductibility determinations and eligibility determinations, and specifically Section 57.9C provides that State Fire Marshal makes deductibility determinations and provides the procedure by which that happens, which is a procedure where the State Fire Marshal makes a determination after a leak or an occurrence, whatever the language is, has been discovered and reported. And so what we have here in this case is we don't have a State Fire Marshal determination that was made under the circumstances contemplated by Section 57.9C because Section 57.9C provides a prospective guide for who makes a deductible determination and how it is made when a new incident occurs. Does the term prospective appear in the statute? The specific word prospective does not, Your Honor. Well, wouldn't the statute say it says that this is prospective only? Well, it is the subsections 1 and 2 of Section 57.9C, which talk about the procedure by which a Section 57.9C determination is made. The legislature could have included a third subsection that would have provided that in addition to authorizing the State Fire Marshal to make deductible determinations with regard to newly reported leaks that the State Fire Marshal could also make deductible determinations to old leaks that would invalidate any prior decision by the EPA. But the statute does not include any such language, and it does not because it was not the legislative intent for deductible determinations made under the new statute for incidents that have already been reported and already have deductible determinations. It was not the legislature's intent for them. Wasn't the legislature used to empower the EPA to be making these determinations and deductibility, not the State Fire Marshal's office? The EPA was empowered. If I can catch your question. Isn't the statute used to indicate that the EPA would be making deductible determinations? Correct, Your Honor. The statute has not been changed, so the EPA no longer has that authority. The EPA does not have the authority to make a determination with regard to a new leak. So, for example, if this leak had been reported in 2008, there's no question the State Fire Marshal would be. The statute now talks about eligibility and deductibility determinations made by the office of the State Fire Marshal. Correct. Is that correct? That's a change from how the statute used to read? Yes. And the change eliminates the EPA from being part of this process now? Well, it would eliminate the EPA from making new deductibility determinations. Counsel, listen to the question I'm asking. Okay. The EPA is no longer part of this statute, is it? Well, the EPA applies deductible determinations. It's not charged with making deductible determinations. It says, Eligibility and deductibility determinations shall be made by the office of the State Fire Marshal. Correct, Your Honor. And 57.9C makes no further reference to the EPA in that regard, does it? No, Your Honor. Okay. So, what was the intention of the legislature in eliminating the EPA from having a role in this process? Well, the intent is illustrated by the legislative history where the, I don't remember the Senator's name off the top of my head, but explained that the reason that responsibility was shifted from the EPA to the State Fire Marshal was due to administrative efficiency because the State Fire Marshal is the agency that goes on site at the time a leak is reported and is therefore in a better position to communicate deductibility and eligibility procedures to an owner at that time. And in fact, 57.5C requires the State Fire Marshal to supply that information. Was the State Fire Marshal's determination regarding the deductibility matter in this case unlawful? Well, there's no clear authorization for it. Is that a yes or no, counsel? I'm not sure I understand what you're saying. Well, what I'm saying is that the statute doesn't directly answer that question because it doesn't provide. Let me rephrase it. Okay. The State Fire Marshal determined the deductibility shall be $10,000. Correct, Your Honor. Is that in violation of the law? I don't believe there's any violation of the law, no, Your Honor. So when they made that determination under the statute as amended, the position of the EPA is we should second-guess that determination because the legislature really meant for the EPA to still have a role in this? It's not saying that the EPA should second-guess the determination. It's whether the effect of that determination was to automatically invalidate other prior determinations that nobody is questioning were valid at the time it was made. Well, no action was taken on that, was it? No, Your Honor. There were no payments made prior with regard to that deductible. And so what the practical consequence of petitioner's theory or interpretation of the act would be that any determination made by the EPA prior to 1993 when it was the agency that was authorized to make such determinations could be automatically invalidated by a subsequent State Fire Marshal determination made after the changes in the act. Even if that's the case, what's the problem with that? Well, the problem with that... If that, in fact, reflects the legislative policy that the State Fire Marshal's office shall be the person making the determination now.  The first is the one that I mentioned earlier, that it appears from the legislative history that the purpose for shifting responsibilities to the State Fire Marshal was not to invalidate any old decisions by the EPA. The legislature didn't say anything that it was unhappy with the way the EPA... Well, we've seen other instances where the legislature, when they want to preserve past decisions and rulings, have said, and by the way, this new amendment has nothing to do with decisions and rulings and administrative determinations here to formate. Right. Did they say that in this statute? No, they didn't, Your Honor. And that's why I think the statute is not clear as to how this specific situation is resolved, and that's why the EPA... And a way to clear up the situation is to add the term EPA to the statute from which that term was deleted by the legislature. Well, I mean, the new statute actually, though, does importantly keep the language from the original statute that only one deductible determination shall apply per site and occurrence. So that indicates that a preexisting deductibility determination has a life that essentially runs with the property, that it's essentially like an easement, that it runs with the land, that once this determination is made, it stays with the incident. But back to your earlier question, the second problem with interpreting the statute in such a way that a state fire marshal determination automatically invalidates an older EPA determination is that at the time the amendments were made to the Act, there was an overwhelming concern that the fund was underfunded and that people were not being repaid for prior actions because there simply wasn't enough money in the fund. Maybe there was also a rejection of how the EPA was handling this entire issue, and the legislature was tired of its handling it and shifted it to a different administrative agency to handle it better and more efficiently. Well, there's nothing in the legislative history that indicates that. Other than that's what happened. Well, that they changed it, but there's an explanation given in the legislative history that the reason was for administrative convenience because the state fire marshal was present. This is several times I've referred to the legislative history. Whose history? What does that mean? Who are you describing this to? It was, I believe it was Senator Mehar who said that the only change to the program was that the state fire marshal was going to be making the new decisions, and it was because it's easier for the state fire marshal to communicate. And everyone in the Illinois State Senate agreed with him? Well, that's a limitation of any legislative history. And everyone in the Illinois House of Representatives was told what that senator said, and they agreed with him too when they passed it? Well, I mean, I think, Your Honor, obviously one comment is not always going to be dispositive, but if the legislature had intended for all old decisions to be automatically invalidated, it could have provided language to that effect in the statute. The legislature didn't provide language one way or the other. And with regard to the underfunding of the fund, that's problematic here, because under petitioner's interpretation of the act, every owner who received a $100,000 deductible determination by the EPA in the past would now have an incentive to reapply for a new deductible determination with the state fire marshal. And if the state fire marshal entered a lower, as in this case, rendered a decision for a lower deductible, the EPA would then be required to apply that new deductible. There would be no review of the state fire marshal's decision. What's wrong with that? Because it would further deplete the fund, Your Honor, and that was a specific problem. But you can appeal, can't you? The owner can appeal, but under petitioner's theory, once the state fire marshal made its determination, the EPA would be required to apply that determination. Okay, so there's no appeal right on the part of the agency. Right. And I believe petitioner even says in his reply brief that the state fire marshal's determination was unreviewable. At that point, the EPA would be required. It would be reviewable if the owner wanted to appeal. But the EPA, under the petitioner's theory, would be required to apply that decision. And that would create, and it seems unlikely that at a time where the fund was so underfunded that at the exact same time the legislature was amending the act to solve the underfunding problems, it would also create a mechanism whereby anybody who had ever gotten a $100,000 determination by the EPA could then go back to the state fire marshal in the hopes of getting a lower determination. Well, let me ask you this. How do you respond to counsel's argument that the estate expresses an interest in cleaning up this property? However, before it's going to take any action, it's going to find out what the state fire marshal says is the deductible. They find out it's $10,000, and they say, okay, we can handle that. Where's the fairness there? Where's the equity? Well, right. Well, first, that would go to the fairness and estoppel issue, which it's important to separate from the statutory issue because if the court adopts petitioner's statutory argument, that would have a wide-ranging effect. That would affect every other future case, whereas the estoppel argument would be limited to the facts of this case. And with regard to that estoppel and fairness argument, I would just point out the strong presumption against applying estoppel against the state when public funds are involved. The courts held that estoppel isn't applied when the mistake, and the EPA admits that a mistake was made. They're not saying that there was no mistake here. But here the mistake was made by a ministerial official at the EPA. This is a relatively limited mistake. There was no long pattern of saying it was $10,000. And so this is that situation of an unintentional mistake by a ministerial officer at the EPA, where the presumption against applying estoppel against the state would apply in this case. Mr. Visit, I wanted to ask you a question. The EPA doesn't share your position, does it? About what? On anything. I mean, they went ahead and paid the balance. How does that work? Well, as the board held when it denied the motion to dismiss, the EPA, under Reichhold, did not have the authority to reconsider its previous decision on the payment request denial. And so, although the EPA may have decided that. I don't actually know exactly why that decision was made. It could have been made simply because they thought it wasn't worth the cost of continuing on with the litigation or whatever. But the EPA, at that point, the board held that it couldn't reconsider its earlier decision. And then the EPA did argue before the board and the proceedings for the board, consistent with the arguments I'm making today, that the EPA was not statutorily required to apply the State Fire Marshal's deductible determination. And in addition, there's the timing issue of whether or not the EPA re-reviewed the Stage 3 investigation plan and budget when it denied the payment request from the fund. With regard to that issue, neither the Act nor the board's rules direct the EPA to review a deductible determination when a plan and budget is submitted for approval. The plan, as all plans are, is just a sequence of different events and activities that are designed to achieve a specific goal. And the budget, it simply is the corresponding cost to those activities. And when the EPA reviews a plan and budget, the EPA conducts a technical review and a financial review and simply looks to ensure that the costs are reasonable, that the costs are consistent with the plan and incurred in performance with the plan. And those three factors, those three elements relating to the relationship between the activities in the plan and the corresponding costs are essentially mirrored in both Section 57.7C3 of the statute and 734.510B of the rules. So when the EPA reviewed the payment request, it was not re-reviewing any other deductible determination because although the deductible under the administrative rules must be included with the budget, all of the language regarding what the EPA reviews when it reviews a plan and budget simply goes to whether or not the activities are consistent with accomplishing the goal of the plan and then whether the corresponding costs are reasonable and necessary in light of those goals. And very briefly, since your honors did ask about the payment that was made earlier, that is a, and the voluntary payment doctrine was mentioned in the briefs. The voluntary payment doctrine would not apply in this case because it only applies for attempts to recoup money that has been spent. And here, that was not an issue before the board. The board simply affirmed the denial of repayment from the fund. It did not order a petitioner to repay any money to the EPA. And all those issues are currently pending before the board and are stable pending a resolution of this appeal. So in conclusion, I would just like to say, unless your honors have any further questions, that in this case, by applying the $100,000 deductible, the EPA relied upon an administrative rule that fits within the statutory framework of the act and is consistent with the purposes of the act. And for that reason, I would ask the court to affirm the board's order. Thank you, Mr. Blizzard. Thank you. Mr. Shaw, any rebuttal? If I may, the state makes the argument that the OSFM determination is really something made in respect to things on the ground or facts on the ground at a particular place and time. When the estate filed an election to proceed its owner, the application saying we own the property now, we intend to go forward pursuant to Title 16 of the act, the agency approved that, sent us a letter recognizing the election, approving it, and told us in the letter, you may be eligible for reimbursement from the LUST program. Contact the office of the state fire marshal. That is quoted in my brief. That's not an incident that's occurring. You're not going to the office of the state fire marshal because there's some incident occurring on the site. You're going to the office of the state fire marshal because the office of the state fire marshal is the legislatively designated person to determine whether or not you're eligible to access the fund and what your deductible is. We did that. Perhaps not in that order, as I recall, but we went to the state fire marshal and got an eligibility determination saying, yes, you are eligible. We had to file out lots of paperwork for that, and here's what your deductible would be. The deductible is $10,000. There was also testimony at the hearing from the head of the LUST program who basically said he advises people calling and asking him questions about elections to proceed, whether or not they should do it, what's this involve. They're nervous about it. Environmental law, they may be in for something, and he advises them to check with the state fire marshal to find out what your deductible would be. So we're not doing something crazy or insane or asking for it. When the state contacted the fire marshal to determine the deductible, was the executor or whoever was in charge of the state aware that the EPA had currently actually set a deductible at $100,000? The state was not aware of a $100,000 deductible until it received that decision that has been appealed here. We were not aware of that, didn't know it existed, didn't know that it would exist. We didn't realize it would have any relevance to us. We have a deductible that was issued to us. We were found to be eligible. We basically got an insurance policy decision. The state of Slidham, it's a separate entity from Gerald v. Slidham, and here's what we got. We were not aware of this until we submitted an application for payment for something like $83,000, $84,000, and it was denied. It told us that that letter is denied and you have a $100,000 deductible, and since we've already paid you $20,000, you owe us so much and we'll just take that out of the future work. That was the context of the letter. That letter wasn't the first time we learned about it, and that's the letter we appealed. I also want to emphasize one of the differences between the previous program, and there are many of them. I still think the pre-1993 program is a fairly provisional program because a lot of rules were changed. The Police Control Board's rules were changed. The agency's rules were changed. The State Fire Marshal's rules were changed. But one of the problems in the old system that was corrected and changed was eligibility terminations were not applied. So if the agency told you, told Gerald Slotin, you're eligible for reimbursement, you've got a $100,000 deductible, that was not appealable. That was not a final decision. That was just telling you something that's coming down the road. What you would have to do at that point in time is submit payments, do work, submit payments, reimbursements for payments, and then when they said, well, we're going to apply this $100,000 deductible, that was what was appealable. So this decision, the earlier decision that the agency is enforcing, is technically not final and appealable. It is of not the same nature as State Fire Marshal determinations today. Now what does that mean as a practical matter? Could somebody go in there and figure out how to reopen this? So unless Gerald Slotin had done the work at that time, he had no opportunity to even appeal that deductible. Is that what you're saying? He would have had to do work and submit bills. And what the agency did, and I think this was good for them, is they recognized that this is something that would be useful for people to know. They kind of made an informal process that was not really with the regs or the statutes. But as a result, though, there's not a formal appeal process or the other formalities. It's a letter. That is what is there. If I could just take one moment to make sure. We're asking for the agency's decision to be reversed. We are certainly not asking for another, you know, we do recognize that a check was sent our direction to us. To our people. We're not asking for two bites of the apple. I want to make sure that that is clear. We are asking, though, also that if the court does agree with us that they direct or ask the Pollution Control Board to consider our attorney fee petition on remand. There are attorney fee provisions that are available under the Act. I don't think that is ripe here. I think that's the process by which the Pollution Control Board would then be allowed to exercise its discretion. Thank you, counsel. Thank you. We'll take this matter under advisement and be in recess.